IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 90-1992
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus


JACKY RONALD PACE,

Defendant-Appellant.


_____

Appeal from United States District Court
for the Northern District of Texas
_____
(December 17, 1993)

Before POLITZ, Chief Judge, HIGGINBOTHAM, Circuit Judge, and
WINGATE*, District Judge.

WINGATE, District Judge:

Appellant Jacky Ronald Pace was convicted on September
15, 1989, by a district court jury of all counts of a nine-count
indictment charging him with conspiracy to commit certain con-
trolled substance offenses, various substantive drug offenses,
and using a firearm in relation to a drug offense, all in viola-
tion respectively of Title 21 U.S.C. §§ 846, 841(a)(1) and Title
18 U.S.C. § 924(c).  Aggrieved over the convictions, appellant
now raises four issues for review:  (1) whether the district
court abused its discretion and violated the appellant's consti-
tutional right to confrontation by allowing the

_____
*District Judge of the Southern District of Mississippi, sitting
by designation.

prosecution to call as a witness appellant's probation officer for the purpose of establishing the location of appellant's residence; (2) whether the district court was correct in its assessment that the government's proof was sufficient to convict appellant under Title 18 U.S.C. § 924(c) for "using a weapon during and in relation to" a drug offense; (3) whether the district court's instructions to the jury relative to this § 924(c) gun offense were legally adequate; and (4) whether the district court was remiss in failing to provide appellant a complete, accurate trial record. Finding no reversible errors, we affirm the appellant's conviction.

The principal characters involved in this criminal scenario were the appellant; his co-defendant, China Lewis, Sr., and Charles Phillip Springer of the City of Fort Worth, Texas, Police Department, who was acting in an undercover capacity. Appellant's present predicament began on January 18, 1989, when a government informer introduced an unkempt, long-haired Springer as "Phil" to an unsuspecting Lewis, who was led to believe Springer was a potential distributor of large quantities of amphetamine for Lewis. Once Lewis was confident of Springer's interest, Lewis asked Springer to join Lewis' criminal venture which included Lewis' partner named "Jacky." The next day, January 19, 1989, Lewis introduced Springer to "Jacky," who is our appellant. At this meeting of the threesome, the parties negotiated the terms of their arrangement, and Springer agreed to market amphetamines for Lewis and the appellant. However,

2

unknown to either appellant or Lewis, Springer had on his person a hidden transmitting device which permitted a nearby surveillance group of narcotic officers to overhear and to record the conversations.

The obliging appellant was active in the negotiations with Springer. Appellant suggested prices for the "product," debated the relative merits of various types of cutting agents, and recommended a retail store where the mention of the appellant's name would generate a generous 50% discount. Additionally, the appellant promised to supply Springer with a quarter pound of amphetamine the following day, January 20th. After the appellant left, Lewis gave Springer 30.26 grams of a powdery substance containing 45% amphetamine and four one-pound bags of marijuana to sell. The next day, on January 20th, pursuant to his promise of the preceding day, the appellant delivered to Springer, through Lewis, 99.08 grams of a white powdery substance which contained 90% amphetamine.

On January 25th and 30th, Lewis supplied Springer with additional amounts of amphetamine. On the 25th, Lewis gave Springer 111.9 grams to sell and on the 30th, 114.9 grams. On the 25th, Lewis explained that he would have supplied four more ounces, but he could not obtain the extra amount because his source, the appellant, was in Corsicana, Texas, where appellant had another amphetamine laboratory.

On February 6th, Springer, along with other officers, decided to end the undercover operation and arrest the subjects.

3

First, they arrested Lewis. The officers then obtained an arrest warrant for the appellant and proceeded to his reputed residence of Lot 34, Paradise Estates, a mobile home park in Johnson County, southwest of Mansfield, Texas.

The officers surrounded the mobile home and entered it when their presence was discovered by the occupants therein. Besides appellant, a Pamela Lanell Gilreath was inside the mobile home. Officer Darrell Pena of the Narcotics Division, Fort Worth Police Department, entered first. Upon entering the mobile home, Officer Pena immediately encountered the appellant, whom he grabbed and passed to the officers behind him. Officer Pena observed a weapon, a Llama .38 caliber handgun, on a couch in the front living room.

After obtaining a search warrant, the officers searched the mobile home for illegal drugs and seized two additional weapons. A Rossi .38 caliber revolver was found in the master bedroom on the bed's headboard/book shelf in an unzipped pistol case. An Ithaca .45 caliber semiautomatic handgun was found in the other bedroom between a set of boxsprings and a mattress. All of the firearms were loaded.

The officers also seized large quantities of amphetamine which were secreted about the mobile home. Approximately seven pounds of amphetamine in powder form and of a very high purity were seized, as were three and one-third quarts of amphetamine oil which, in its finished state, could produce eight pounds of amphetamine. The officers also found paraphernalia

4

associated with the manufacture of amphetamine, including scales, miscellaneous flasks, glassware, a grinder, and filter paper. The officers additionally discovered a sizeable amount of cash: $3,800.00 in a bank bag; $1,000.00 in a bag; $355.00 in an address book; and $91.00 in a glass jar.

Following the search, Presley Darnell, criminal investigator with the Internal Revenue Service, asked Officer Michael DeLaFlor of the Narcotics Division, Fort Worth Police Department, how much amphetamine had been found. Officer DeLaFlor responded. Then Pace, who had not been addressed, disagreed with Officer DeLaFlor's estimate and said, "No, there's only two or three pounds." Officer DeLaFlor corrected Pace, and Pace, who earlier had been given his Miranda rights, said, "Yes, if you include four pounds in the back, yes, it would have been a total of about seven." Record VII at 115-17.

On February 22, 1989, the appellant, along with two co-defendants, China Lewis, Sr., and Pamela Lanell Gilreath, were charged in a nine-count indictment. Count 1 charged the appellant with conspiracy to commit certain controlled substance offenses, including the manufacture, possession with intent to manufacture, distribution, and possession with intent to distribute amphetamine, a Schedule II controlled substance, in violation of Title 21 U.S.C. § 846. Counts 2 through 6 charged the appellant with the distribution of amphetamine in violation of Title 21 U.S.C. § 841(a)(1). Count 7 charged the appellant with possession with intent to distribute in violation of Title 21

5

U.S.C. § 841(a)(1). Count 8 charged the appellant with possession with intent to manufacture amphetamine in violation of Title 21 U.S.C. § 841(a)(1). And, count 9 charged the appellant with the use of firearms during and in relation to the drug trafficking offenses alleged in counts 1, 7 and 8 in violation of Title 18 U.S.C. § 924(c). Following a jury trial, on September 15, 1989, the appellant was convicted of all nine counts.

## ISSUE NO. I

**WHETHER THE TRIAL COURT ERRED IN ADMITTING THE TESTIMONY OF A UNITED STATES PROBATION OFFICER FOR THE PURPOSES OF ESTABLISHING THE APPELLANT'S RESIDENCE.**

Although appellant had been arrested in the mobile home containing a cache of amphetamine and an amphetamine laboratory, at trial the government hoped to show a stronger connection between appellant and the mobile home, namely, that it was his residence. In an earlier court proceeding, the government had stipulated that the mobile home was the residence of co-defendant Pamela Gilreath.[1] The government expected to establish through the testimony of Officer Springer that it was also the residence of the appellant, Gilreath's live-in lover.

At trial, Springer testified as the government expected. However, when defense counsel objected to the testimony on grounds of hearsay, the trial court sustained the objection

---

[1] During a hearing held pursuant to appellant's motion to suppress evidence found at the mobile home, the government stipulated that the mobile home in question was the residence of Pamela Gilreath. There also was testimony that the utilities were in her name. Record III at 39-40, 132-33.

6

and instructed the jury to disregard Springer's testimony on the point.

The United States then called as a witness David Stout, a United States Probation Officer, to testify that the mobile home was appellant's residence. During the time of the alleged offenses which are the subject of this opinion, the appellant was on pretrial release in another criminal case.[2] Stout's duty was to monitor that pretrial release.

The government first asked Stout his name and then asked "[h]ow are you employed, Mr. Stout?" Within the hearing of the jury, Stout replied, "I am employed as [a] United States Probation Officer."

In a conference before the bench, outside the hearing of the jury, the appellant's counsel immediately objected to the government's use of a probation officer as a witness. Appellant's counsel argued that any testimony from a probation officer inevitably would signal to the jury that the appellant was under some sort of judicial supervision for a previous offense.[3]

---

[2]During this period, the appellant was on pretrial release in a prior related case. The appellant was indicted on June 16, 1987, in Criminal Action No. 4-87-082, and charged with various controlled substance offenses, along with thirty co-defendants. He was subsequently convicted of those charges and was sentenced to life without parole, as well as other concurrent sentences, in a combined sentencing hearing with the instant case on November 9, 1989.

[3]Appellant's counsel also made an objection based on the Fifth Amendment pursuant to the theory that an individual subject to pretrial release is required to reveal his whereabouts to his probation officer. Therefore, testimony by the probation officer in regards to that information would be tantamount to compelled self-incrimination. On appeal, the appellant apparently has

7

Counsel for the government then explained that Stout had twice been to the appellant's residence, once in December 1988 and once in January 1989, during the time the underlying events of this cause had occurred. Counsel for the United States emphasized the limited purpose of Stout's testimony, i.e., only to establish the location of the appellant's residence. The government further argued that the necessity for Stout's testimony was occasioned because appellant's counsel earlier had raised this issue. Ultimately, the trial judge overruled the appellant's objection, agreeing with the government that appellant had raised the question concerning his address.[4]

Appellant's counsel did not cross-examine Stout before the jury. After the government rested its case and after appellant rested without calling any witnesses, appellant's counsel examined Stout outside the presence of the jury in order to make a record and preserve his objection. He made no attempt to show bias, mistake, or lack of credibility. Instead, appellant's counsel only tried to establish the foundation for his now-abandoned theory that the testimony of a probation officer violated appellant's Fifth Amendment rights because an individual

_____

abandoned this particular theory.

[4]Presumably, the United States Attorney was referring to the appellant's hearsay objection, which the trial judge sustained, to Springer's testimony in regards to the address of the appellant's residence. However, the appellant now concedes that the appellant's residence is not an element that need be proven. Nor, according to appellant, was it ever in question that the appellant's residence was located at Lot 34.

on pre-trial release has a duty to disclose the whereabouts of his residence to his probation officer.

In response to the concern of the appellant's counsel that Stout's announced occupation as a Probation Officer lent the inference to the jury that the appellant was on probation for some crime he had committed, the trial judge decided to give a curative instruction to the jury. Given immediately before the judge charged the jury, this curative instruction advised the jury that the appellant was not on probation at the time of Stout's visits.[5] The appellant objected to this instruction, stating that it would further confuse the jury, would not adequately cure the harm, and was not supported by the evidence. The trial judge overruled these objections.

The appellant on appeal sets forth two theories to support his assertion that the admission of the testimony of the appellant's probation officer was reversible error. Firstly, the appellant argues that the government's use of the probation officer as a prosecution witness violated appellant's Sixth Amendment[6] right to cross-examination on the theory that the

---

[5]The trial court's curative instruction was as follows. "You are instructed that the defendant, Jacky Ronald Pace, was not on probation for any criminal offense during December of 1988 and January of 1989 when Mr. Stout visited him. He was not on probation for any criminal offense."

[6]The Sixth Amendment to the United States Constitution provides:

> In all criminal prosecutions, the accused
> shall enjoy the right to a speedy and public
> trial, by an impartial jury of the State and
> district wherein the crime shall have been

9

government created a situation whereby it was impossible for appellant to exercise effectively his right to cross-examine Stout without prejudicing himself. Secondly, the appellant argues that Federal Rule of Evidence 403[7] was violated because the prejudicial impact of the probation officer's testimony greatly outweighed its probative value. Each objection will be discussed separately.

## A.  Sixth Amendment

Appellant claims that he could not effectively cross-examine the probation officer/witness without eliciting prejudicial information about his criminal history and pretrial release status. Thus, continues the appellant, the only way he could avoid these revelations was to forego cross-examination entirely. From this, appellant concludes that his Sixth Amendment right of cross-examination was violated. We disagree.

---

committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation;  to be confronted with the witnesses against him;  to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence. U.S. Const. amend. VI (1789).

[7]**Rule 403.  Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time**

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The confrontation clause of the Sixth Amendment guarantees a criminal defendant the right to cross-examine the witnesses arrayed against him. See Davis v. Alaska, 415 U.S. 308, 315, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974) ("confrontation means more than being allowed to confront the witness physically"); Smith v. Illinois, 390 U.S. 129, 131, 88 S.Ct. 748, 749, 19 L.Ed.2d 956 (1968) (holding that the right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him); Pointer v. Texas, 380 U.S. 400, 403-04, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965) (holding "that the Sixth Amendment's right of an accused to confront the witnesses against him is likewise a fundamental right and is made obligatory on the States by the Fourteenth Amendment" and includes "... the right of cross-examination."); see also United States v. Oroni, 535 F.2d 938, 945 (5th Cir. 1976) (holding that "[T]he Sixth Amendment confrontation clause guarantees to a criminal defendant the right to cross-examine a witness against him."). However, the confrontation clause guarantees the defendant "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 18-20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985). "Normally the right to confront one's accusers is satisfied if defense counsel receives wide latitude at trial to question witnesses." Pennsylvania v. Ritchie, 480 U.S. 39, 53, 107 S.Ct. 989, 999, 94 L.Ed.2d 40 (1987).

11

Cases which have found violations of the constitutional right to cross-examination can be divided into two broad categories. See Fensterer, 106 S.Ct. at 294. The first category encompasses those cases involving the admission of out-of-court statements. See Tennessee v. Street, 471 U.S. 409, 413, 105 S.Ct. 2078, 2081, 85 L.Ed.2d 425 (1985); Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); California v. Green, 399 U.S. 149, 157, 90 S.Ct. 1930, 1934, 26 L.Ed.2d 489 (1970); cf. Bruton v. United States, 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 80 L.Ed.2d 476 (1968). The second category includes those cases involving restrictions, imposed by law or by the trial court, on the scope of cross-examination. See Davis, 415 U.S. at 318, 94 S.Ct. at 1111; Smith, 390 U.S. at 131, 88 S.Ct. at 750.

The instant case falls within neither of these two broad categories. The first category is completely inapplicable. And, since the second category is seemingly limited to those restrictions directly imposed by the law or the trial court, this category, too, does not embrace our circumstance, where the defendant made a decision that cross-examination was not in his self-interest. The circumstances here are unlike those in Davis v. Alaska, where the trial court did not permit the defendant to "expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." 415 U.S. at

12

318, 94 S.Ct. at 1111; or those in <u>Smith v. Illinois</u>, 390 U.S. at 130-31, 88 S.Ct. at 749, where the trial court prohibited the defendant from questioning the informant/witness, the government's key witness, about his true name and address.

Nevertheless, in his efforts to fit within the boundaries of those cases condemning court-imposed restrictions on cross-examination, appellant champions the Sixth Circuit opinion of <u>United States v. Calhoun</u>, 544 F.2d 291 (6th Cir. 1976), a case somewhat factually similar to the one before this Court. In <u>Calhoun</u>, the Sixth Circuit held that the trial court abused its discretion in admitting the testimony of the defendant's parole officer identifying the defendant as the robber shown in surveillance bank photographs. The <u>Calhoun</u> Court concluded that the defendant could not freely examine the relationship between the defendant and the witness without revealing the prejudicial fact that the defendant was on probation at the time of the robbery. <u>Calhoun</u>, 544 F.2d at 295-96. The appellant argues that, like the defendant in <u>Calhoun</u>, he had no real choice but to forego cross-examination. However, the appellant's reliance on <u>Calhoun</u> is misplaced.

<u>Calhoun</u> offers no support for the appellant's Sixth Amendment-based argument because the <u>Calhoun</u> Court expressly declined to reach the constitutional issue. Instead, the <u>Calhoun</u> Court held that the trial court abused its discretion based on the Federal Rules of Evidence. <u>Id.</u>

13

We hold here that the trial court did not impose restrictions on appellant's cross-examination of Stout in violation of the Sixth Amendment.  The trial court admonished Stout not to reveal the appellant's status as a pre-trial releasee, and we assume that the witness would have obeyed the judge's order.  So, had the appellant chosen to cross-examine the witness in front of the jury, he could have done so freely, except on the appellant's pre-trial release status which was not shown to be relevant to the credibility of the witness.  The trial court did not shackle any efforts of appellant to probe the credibility of the witness or to elicit contradictory testimony.  The trial court did not handcuff any endeavors by appellant to test the memory of the witness on the specifics of his alleged conversation with appellant or the directions to the mobile home.  The trial court submitted the witness to appellant for open cross-examination;  the appellant voluntarily declined the offer.

Even were we to characterize the events below as the equivalent of restrictions directly imposed by a trial court, this court still would not find a violation of the appellant's constitutional right to confront the witnesses against him.  In this circuit, the standard for reviewing a district court's restrictions on cross-examination is found in United States v. Baresh, 790 F.2d 393, 400 (5th Cir. 1986).  This Court must "determine whether the trial court imposed unreasonable limits on cross-examination such that a reasonable jury might have received a significantly different impression of a witness' credibility

14

had defense counsel pursued his proposed line of cross-examination." Id.; see Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986). Appellant made no offer of proof that the witness harbored bias or prejudice which, if explored, would have revealed the witness' true relationship with the appellant. Instead, appellant's cross-examination of Stout outside the jury's presence was merely occupied with developing appellant's now-abandoned theory that appellant's Fifth Amendment rights had been violated because appellant, a pre-trial releasee, was required to divulge the location of his residence. We do not see on these facts a transgression of appellant's Sixth Amendment right of cross-examination.

## B. Federal Rule of Evidence 403

The appellant next argues that, under Federal Rule of Evidence 403's multi-factor balancing test, the trial court's admission of the probation officer's testimony was an abuse of discretion. The appellant's argument rests on two premises: (1) that the prosecutor's elicitation of the probation officer's occupation was highly prejudicial; and (2) that the probation officer's testimony was not necessary to prove the government's case. Appellant contends that since the United States had sufficiently alternative means of proving the appellant's residence, the government's resort to the testimony of the probation officer was error.

As in his Sixth Amendment argument, the appellant relies primarily on the case of United States v. Calhoun. In

15

<u>Calhoun</u>, the United States employed the appellant's parole officer to identify the appellant as the suspect in a series of photographs taken during a bank robbery, for which the appellant was subsequently convicted.  The Sixth Circuit reversed the appellant's conviction and remanded for a new trial.  <u>Calhoun</u>, 544 F.2d at 297.  The <u>Calhoun</u> Court held that under Federal Rules of Evidence 403[8] and Rule 701[9] the trial court abused its discretion in admitting the testimony of the defendant's parole officer in the absence of a showing of necessity for employing the probation officer instead of some other witness.  The holding of <u>Calhoun</u> was based on the theory that the defendant could not freely examine the relationship between the defendant and the witness without revealing the prejudicial fact that the defendant was on probation at the time of the robbery, although the <u>Calhoun</u> Court declined to reach the constitutional issue.  <u>Id.</u> at 295.

Subsequent cases from the Fourth, Eighth and Ninth Circuit Courts of Appeals have criticized <u>Calhoun</u>, where they have not rejected it outright.  In <u>United States v. Allen</u>, 787 F.2d 933, 937-38 (4th Cir.), <u>vacated</u> <u>on other</u> <u>grounds</u>, 479 U.S.

---

[8]<u>See</u> <u>supra</u> note 7, at p. 11.

[9]**Rule 701.  Opinion Testimony by Lay Witnesses**

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

16

1077, 94 L.Ed.2d 132, 107 S.Ct. 1271 (1987), the Fourth Circuit explicitly rejected <u>Calhoun</u> and held that the testimony of a parole officer identifying the defendants as the individuals appearing in bank surveillance photographs was not unfairly prejudicial under Rule 403.  In <u>United States v. Garrison</u>, 849 F.2d 103, 107 (4th Cir.), <u>cert. denied</u>, 488 U.S. 996, 109 S.Ct. 566, 102 L.Ed.2d 591 (1988), the trial court admitted the testimony of the defendant's probation officer concerning defendant's weight loss after the time of the robbery for which the defendant was being tried.  The Fourth Circuit found that, for purposes of identification, the testimony was not so prejudicial under Rule 403 as to be inadmissible.  Similarly, in <u>United States v. Farnsworth</u>, 729 F.2d 1158, 1161 (8th Cir. 1984), the Eighth Circuit, confronted with a situation nearly identical to that in <u>Calhoun</u>, also expressly rejected the holding of <u>Calhoun</u>.  The <u>Farnsworth</u> Court held that it was not an abuse of discretion for the trial court to have permitted parole officers to identify the defendant.  <u>See also</u> <u>United States v. Wright</u>, 904 F.2d 403, 405 n.3 (8th Cir. 1990), a case factually similar to <u>Calhoun</u> and <u>Farnsworth</u>, followed <u>Farnsworth</u> and approved its rejection of <u>Calhoun</u>.  In <u>United States v. Langford</u>, 802 F.2d 1176, 1179 (9th Cir. 1986), the defendant's parole officer testified that the person depicted in bank surveillance photographs taken during a robbery was the defendant.  The Ninth Circuit held that given the familiarity of the parole officer with the defendant the opinion testimony of the parole officer was sufficiently probative to

outweigh the danger of unfair prejudice.  Then, in United States
v. Butcher, 557 F.2d 666, 670 (9th Cir. 1977), the Ninth Circuit
upheld the district court's admission of opinion testimony by
police and parole officers, on the basis of their prior contacts
with the defendant, that the defendant was the person depicted in
bank surveillance photographs.  The Butcher Court held that it
was not prejudicial for the district court to admit police and
parole officers' testimony despite the existence of alternative
evidence in the record.  557 F.2d at 669-70.

We add our voice to the chorus of these cases insofar
as they reject an inflexible holding that a trial court's deci-
sion to allow a defendant's parole officer to testify against the
defendant is a per se violation of Rule 403.  Rather, we choose
to apply to these situations, which promise to occur under
varying circumstances, the same balancing test of prejudice and
probativeness, as customarily applied under this rule.  Hence, we
recognize that, based upon the material facts of a case, our Rule
403 slide rule analysis might calculate different results.

Before applying our Rule 403 measuring rod to the facts
of this case, we point out that when a trial judge's determina-
tion as to the admissibility of evidence is questioned on appeal,
our applicable standard of review is abuse of discretion.  United
States v. Barron, 707 F.2d 125, 128 (5th Cir. 1983);  United
States v. Brown, 692 F.2d 345, 349 (5th Cir. 1982);  United
States v. Beechum, 582 F.2d 898, 911 (5th Cir. 1978) (en banc),
cert. denied, 440 U.S. 920, 99 S.Ct. 1244-45, 59 L.Ed.2d 472

18

(1979). The exclusion of evidence under Rule 403 should occur only sparingly:

> Relevant evidence is inherently prejudicial; but it is only <u>unfair</u> prejudice, <u>substantially</u> outweighing probative value, which permits exclusion of relevant matter under Rule 403. Unless trials are to be conducted on scenarios, on unreal facts tailored andsanitized for the occasion, the application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect. As to such, Rule 403 is meant to relax the iron rule of relevance, to permit the trial judge to preserve the fairness of the proceedings by exclusion despite its relevance. It is not designed to permit the court to "even out" the weight of the evidence, to mitigate a crime, or to make a contest where there is little or none.

<u>United States v. McRae</u>, 593 F.2d 700, 707 (5th Cir.), <u>cert. denied</u>, 444 U.S. 862, 100 S.Ct. 128, 62 L.Ed.2d 83 (1979).

We find here on balance that the trial court committed error in allowing the probation officer to state his occupation to the jury. In the context of this trial, this information was unduly prejudicial. Other courts, too, have found error when a government witness reveals to the jury, or gives testimony from which the jury could infer, that the defendant is on probation or has been recently involved in illegal conduct. <u>See</u> <u>United States v. Fortenberry</u>, 860 F.2d 628, 632 (5th Cir. 1988); <u>United States v. Poston</u>, 430 F.2d 706, 709 (6th Cir. 1970).

However, here, in light of the overwhelming evidence of appellant's guilt and, secondarily, the curative instruction, we find the trial court's error of allowing the government to elicit

19

the occupation of David Stout as a United States Probation

Officer to be harmless.  See Bruton v. United States, 391 U.S.

123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968) (curative

instructions may be sufficient to cause a jury to disregard

prejudicial testimony;  United States v. Pavon, 561 F.2d 799, 803

(9th Cir. 1977) (error held harmless due to overwhelming evidence

of guilt and curative instruction);  United States v. Harrell,

737 F.2d 971, 978 (11th Cir. 1984) (error held harmless because

of overwhelming proof of defendant's guilt);  United States v.

Mortazavi, 702 F.2d 526, 529 (5th Cir. 1983) (error held harmless

because of overwhelming proof of defendant's guilt);  United

States v. Klein, 546 F.2d 1259, 1263 (5th Cir. 1977), reh'g

denied, 550 F.2d 42 (5th Cir. 1977) (DEA agent's references to

defendant's prior criminal behavior held harmless due to over-

whelming evidence of defendant's guilt and Fifth Circuit's

conviction that agent's comments did not have a substantial

impact on the jury's verdict).  The government's case against the

appellant was based upon a voluminous amount of evidence, largely

unchallenged and unrebutted by the appellant who rested his

defense without calling any witnesses.  The government estab-

lished the elements of the charged crimes by the testimony of

Officer Springer and the corroborative taped conversations among

the parties.  Appellant's co-conspirator made statements which

connected appellant with the laboratory manufacture of amphet-

amine.  Appellant himself is heard on the tapes promising to

supply Springer with the amphetamine later delivered.  When

20

arrested, appellant was found in a mobile home which reeked of amphetamine production from apparatus indicative of a functioning laboratory found there in the mobile home.  A large sum of money was found in the mobile home, along with amphetamine in its finished and unfinished states, and along with weapons.  Appellant, too, was found there, along with his van.  And, if one still has doubts whether the appellant was aware of the mobile home contents, one need only consider his voluntary statement at the scene of the arrest when he corrected Officer DeLaFlor on how much amphetamine was located in the mobile home.  This avalanche of proof in the juridical context of a curative instruction informing the jury that appellant was not on probation or parole effectively neutralized and rendered harmless the government's error of eliciting the occupation of the probation officer in the presence of the jury.

In closing, we strongly urge all trial courts in this circuit to adopt prophylactic procedures for the use of testimony by a probation or parole officer.  Plainly, the appearance of these witnesses before a jury always carries the potential for the interjection of unfair prejudice to the defendant.  Such testimony should not be sprung upon the court, but timely revealed so that the trial court, outside of the jury's presence, may gauge the anticipated testimony upon the weight scales of Rule 403.  The Court in United States v. Pavon, 561 F.2d 799 (9th Cir. 1977), summed up the matter nicely:

> We think that, in any criminal case in which the government proposes to put a defen-

21

dant's probation or parole officer on the stand, the government should, as soon as it knows that it intends to call the witness, so advise the court and defense counsel. The court should then, if asked to do so, permit the defense to object in the absence of the jury. In this way it may be possible to handle the testimony in such a manner that the jury will not know that the witness is a probation or parole officer, or to arrange for similar testimony by another witness, or to substitute a stipulation as in this case. If the value of the testimony does not out-weigh its probable prejudicial effect, and if there is no other way for the government to present it, the court can exclude it entirely. Prosecutors who fail to heed these suggestions will run a serious risk of reversal.

Id. at 802-03.

## ISSUE NO. II

**WHETHER THE GOVERNMENT'S PROOF WAS SUFFICIENT TO CONVICT UNDER TITLE 18 U.S.C. § 924(C).**

At trial, the jury found the appellant guilty as charged of count 9 of the indictment which alleged that, in violation of 18 U.S.C. § 924(c), the appellant had used firearms during and in relation to the drug trafficking offenses alleged in counts 1, 7 and 8. The firearms charged in count 9 were those seized by law enforcement officers during their search of the mobile home on Lot 34. The officers had found a Llama .38 caliber handgun on the couch in the living room; an Ithaca .45 caliber semiautomatic pistol in the second bedroom, between the boxsprings and mattress of a bed; and a Rossi .38 caliber revolver in the master bedroom within a gun pouch on top of the cabinet/headboard of a bed. The appellant contends that the

22

government's evidence failed to satisfy the proof requirements of § 924(c).

Section 924(c) provides that "[w]hoever, during and in relation to any crime of violence or drug trafficking crime ... for which he may be prosecuted in a court of law in the United States, uses or carries a firearm, shall ... be sentenced to imprisonment for five years ...."  We have consistently reviewed convictions under § 924(c) under either the "fortress theory," United States v. Blake, 941 F.2d 334, 342 (5th Cir. 1991), or the "more than mere strategic proximity theory," United States v. Mora, 994 F.2d 1129, 1141 (5th Cir. 1993);  United States v. Williams, 985 F.2d 749, 755 (5th Cir. 1993), or both.  In a nutshell, the "fortress theory" line of cases states that "the sheer volume of weapons and drugs makes reasonable the inference that the weapons involved were carried in relation to the predicate drug offense since they increase the likelihood the drug offense will succeed."  United States v. Wilson, 884 F.2d 174, 177 (5th Cir. 1989).  The second line of cases requires the government to show more than mere strategic proximity.  Id. Here, the government contends that both doctrines apply to this case and support the jury's verdict.

Under either of the above theories, the government's proof must show beyond a reasonable doubt that the accused "used" or "carried" a firearm, "during and in relation" to a prosecutable drug trafficking crime.  Here, the government had to prove that appellant used the three firearms in question in

23

connection with his plan to manufacture and traffic in amphetamine.  See United States v. Blankenship, 923 F.2d 1110, 1114 (5th Cir. 1991);  United States v. Boyd, 885 F.2d 246, 250 (5th Cir. 1989).  Possession of a firearm does not constitute "use" unless the gun formed a part of the narcotics crime.  See United States v. Robinson, 857 F.2d 1006, 1010 (5th Cir. 1988). "Use" does not require the government to prove actual use such as the discharging of or brandishing of the weapon.  The government may meet its burden by simply showing that the weapons facilitated, or could have facilitated, the drug trafficking offense.  See United States v. Capote-Capote, 946 F.2d 1100, 1104 (5th Cir. 1991), cert. denied sub. nom., Rodriquez v. United States, ____ U.S. ____, 112 S.Ct. 2278, 119 L.Ed.2d 204 (1992); see also United States v. Blake, 941 F.2d 334, 342 (5th Cir. 1991), cert. denied, ___ U.S. ___, 113 S.Ct. 596, 121 L.Ed.2d 533 (1992);  United States v. Beverly, 921 F.2d 559, 562-63 (5th Cir.), cert. denied, ___ U.S. ___, 111 S.Ct. 2869, 115 L.Ed.2d 1035 (1991);  Blankenship, 923 F.2d at 1114;  United States v. Rocha, 916 F.2d 219, 237 (5th Cir. 1990), cert. denied, ___ U.S. ___, 111 S.Ct. 2057, 114 L.Ed.2d 462 (1991);  United States v. Coburn, 876 F.2d 372, 375 (5th Cir.), reh'q denied, 885 F.2d 870 (5th Cir. 1989) (en banc);  S.Rep.No. 225, 98th Cong., 2d Sess. 314 n.10, reprinted in 1984 U.S.C.C.A.N. 3182, 3492 n.10.  To determine whether a defendant "used" a firearm, the Court should look not solely to the defendant's intent, but to the totality of the circumstances.  Blankenship, 923 F.2d at 1115 (5th Cir.

24

1991).  Further, the language "during and in relation to" refers to Congress' intent to avoid convictions for inadvertently carrying a firearm in an unrelated crime.  Id.  Accordingly, the presence of loaded firearms at the home of a defendant of drugs, money, and ammunition also may be sufficient to establish the use of a firearm as an integral part of a drug trafficking crime.  See United States v. Blake, 941 F.2d at 342-43;  Capote-Capote, 946 F.2d at 1104;  United States v. Molinar-Apodaca, 889 F.2d 1417, 1424 (5th Cir. 1989).  "Where several guns ... are found on the premises of a drug laboratory, the obvious inference is that they were there to protect the unlawful activity."  United States v. McKeever, 906 F.2d 129, 134 (5th Cir.1990), cert. denied, 498 U.S. 1070, 111 S.Ct. 790, 112 L.Ed.2d 852 (1991).  Further, we have held "that the [g]overnment is only obliged to show that the firearm was available to provide protection to the defendant in connection with his engagement in drug trafficking; ... ."  Molinar-Apodaca, 889 F.2d at 1424, citing United States v. Raborn, 872 F.2d 589, 595 (5th Cir. 1989);  Robinson, 857 F.2d at 1009.

The operative facts of Capote-Capote, 946 F.2d at 1102, are strikingly similar to the facts presently before this Court. In that case, the defendants were arrested in an apartment in which they stored and sold cocaine.  As here, the arresting officers found three firearms in the apartment:  a loaded revolver, a loaded shotgun, and an unloaded machine gun.  Id. The defendants argued that the evidence was insufficient to

25

convict them under § 924(c) because neither of them was seen with a gun, neither mentioned a gun to the informant, and neither was linked to the gun by fingerprints or any indicia of ownership. Id. at 1104. The defendants further argued that the machine gun "was not and could not have been used to facilitate the transaction in its 'partially disassembled' condition." "The machine gun was discovered with a loaded clip beside it inside a zipped bag in a closed drawer in a chest on the second floor of the apartment." Id. Nonetheless, this Court held the evidence sufficient to support a conviction, stating:

> [T]he [machine] gun was not so remote or inaccessible that it could not have been employed as an instrument in the transaction. Weapons in the home may facilitate a drug crime because the defendants could use the guns to protect the drugs. United States v. Onick, 889 F.2d 1425, 1432 (5th Cir. 1989). The jury was entitled to conclude based on the totality of the circumstances surrounding the transaction that the machine gun was there to protect the drugs.

Capote-Capote, 946 F.2d at 1104 (emphasis added). Thus, despite the fact that, as here, the Capote-Capote defendants did not pick up, much less brandish, their weapons and that the machine gun in Capote-Capote was discovered in a state which could suggest storage,[10] the Capote-Capote Court upheld the jury's verdict.

In Beverly, 921 F.2d at 561, government agents suspected that the defendants were storing cocaine in their apartment. In the course of a search of the bedroom in the

---

[10]In contrast, although the Rossi revolver at issue here was found in a gun case, it was still loaded and readily accessible, rather than in a closed drawer.

apartment, pursuant to a warrant, the agents discovered one-half gram of cocaine and two revolvers in a safety deposit box under a mattress.  Id.  Neither of the revolvers fit the description of the weapons that the agents earlier had seen on the defendants. Id.  Still, the Beverly Court found that a reasonable jury could infer that the seized revolvers were to be used to protect the drugs and, therefore, were used "during and in relation to" the drug trafficking charges.  Id. at 563.

In Boyd, 885 F.2d at 250, we upheld a conviction under § 924(c) based on the presence of a single loaded shotgun in the office of a warehouse in which drugs were stored.  Despite the fact that the gun was broken open (apparently for cleaning) when seized and could not be fired until it was closed, we upheld the conviction, noting that "immediately prior to the arrest the shotgun was located within arm's reach of Boyd and that the loaded shotgun could have been made ready to fire within one second."  Id.

In the oft-cited case of Coburn, 876 F.2d at 373, the defendant was driving a pickup truck with a toolbox and farm equipment in the truck's bed when she was stopped at a border checkpoint.  The truck had a gun rack in the rear window which held a .410 gauge shotgun, but the gun was unloaded and there were no shells for it in the vehicle.  While inspecting the truck, Border Patrol agents discovered 218 pounds of marijuana hidden in a false compartment underneath the toolbox.  Id. at 374.  The woman was convicted for possession with intent to

27

distribute marijuana and for using the unloaded shotgun "during and in relation to" the drug trafficking offense. Id. at 375. The Coburn Court held that the government had produced sufficient evidence to prove that "a relationship existed between the shotgun and the predicate drug trafficking offense." Id. at 375. In commenting on the jury verdict, we noted that:

> It was not unreasonable for the jury to infer from the evidence that the shotgun displayed in the rear window of the pickup truck "emboldened" [the defendant], allowing her to display the weapon to protect herself or to intimidate those whom she might meet in the course of distributing the marijuana.

Id. The Coburn Court also noted that the "fact that a firearm is 'unloaded' or 'inoperable' does not insulate the defendant from the reach of § 924(c)." Id., citing United States v. York, 830 F.2d 885, 891 (8th Cir. 1987), cert. denied, 484 U.S. 1074, 108 S.Ct. 1047, 98 L.Ed.2d 1010 (1988).

Thus, the above survey of relevant cases confirms that this Court has found the requisite connection between firearms and the predicate drug trafficking offense under a wide variety of factual circumstances. See also Rocha, 916 F.2d at 237 (the following evidence was sufficient to support conviction under § 924(c): victim observed a bulge in defendant's waistband and believed that said bulge was a gun; loaded .38 caliber pistol was found beneath defendant's automobile seat; four .38 caliber bullets were found on the defendant and a person who was with the defendant prior to and at the time of his arrest also possessed a firearm); United States v. Munoz-Fabela, 896 F.2d 908, 911 (5th

28

Cir.), cert. denied, 498 U.S. 824, 111 S.Ct. 76, 112 L.Ed.2d 49 (1990) (finding that a loaded gun on vehicle floorboard, within view and reach of the defendant providing surveillance for a drug transaction, satisfies the "during and in relation to" requirement of § 924(c)), and Molinar-Apodaca, 889 F.2d at 1424 (upholding § 924(c) conviction upheld based on seizure of the following items in defendant's residence:  an Uzi rifle, a high-powered handgun, several rounds of ammunition, and a "considerable quantity of marijuana").

The evidence is sufficient to support the jury's verdict if a rational trier-of-fact could have found the essential elements of the charged crime proven beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 313-14, 99 S.Ct. 2781-2786, 61 L.Ed.2d 560 (1979);  see also United States v. Ivy, 929 F.2d 147, 150 (5th Cir.), cert. denied, ___ U.S. ___, 112 S.Ct. 234, 116 L.Ed.2d 191 (1991).  Any doubt about the credibility of witnesses or about inferences that can be drawn from the evidence should be resolved in favor of the jury verdict.  See Molinar-Apodaca, 889 F.2d at 1423.  All that § 924(c)(1) requires is that the jury was reasonable in concluding that the weapons were connected to the underlying drug transaction rather than to some other activity.  See e.g., Blankenship, 923 F.2d at 1115.  As pointed out by United States v. Wilson, 884 F.2d 174, 177 (5th Cir. 1989), "under the current version of § 924(c), the government is shouldered with the burden of establishing some relationship between the firearm [the

29

defendant] possessed and the predicate drug trafficking offense."

Thus, applying the totality of the circumstances test, we find on these facts under the "more than mere strategic proximity" theory[11] that the evidence here plainly falls above the threshold level necessary to support the jury's verdict. All three of the firearms were loaded and at the scene of a functional, odiferous laboratory where amphetamine of high purity was being produced and stored in large quantities and where a sizeable amount of cash was located. All of the weapons were available and one, the Llama .38 caliber, was lying on the couch near the door where the officers entered the mobile home during their raid. Hence, we conclude that the jury's reasoned verdict should stand undisturbed.

### ISSUE NO. III

**WHETHER THE TRIAL COURT PROPERLY INSTRUCTED THE JURY ON THE TITLE 18 U.S.C. § 924(C) CHARGE (COUNT 9).**

The appellant contends that his conviction under § 924(c) should be reversed because the trial court's instruction which set forth the government's burden regarding the use of a firearm during and in relation to a drug trafficking offense element was contrary to the law.

---

[11]Although we have chosen not to analyze the facts at issue here against Fifth Circuit "fortress" paradigm cases, we forego this analysis purely for the sake of brevity. This should not be interpreted in any way as a finding, or even the implication, that the conviction here would not be upheld if analyzed under the rubric of the "fortress" cases.

30

The district court read the following charge to the jury.

> The government is not required to prove that the defendant actually fired the weapon or brandished it at someone in order to prove "use," as that term is used in these instructions. However, you must be convinced beyond a reasonable doubt that the firearm played a role in or facilitated the commission of the drug offense. In other words, you must find that the firearm was an integral part of the drug offense charged.

Record I at 205. The appellant concedes that the above portion of the instruction is a correct statement of the law and is the pattern jury instruction currently employed by the Fifth Circuit in § 924(c) cases. See <u>Pattern Jury Instructions for Criminal Cases</u>, <u>United States Fifth Circuit District Judges' Association</u>, 126 (1990). The appellant contends, however, that the remainder of the district court's instruction, reproduced below, constitutes reversible error.

> This element of the crime does not depend on proof that the defendant had actual possession of the weapon or used it in any affirmative manner. It does require evidence that the firearm was available to provide protection to the defendant in connection with his engagement, if any, in drug trafficking.

Record I at 205.

At trial, the appellant specifically objected to the disputed language of the instructions, stating that "the mere availability or the possibility of the use of a weapon is not enough." Record VIII at 52-56. However, the United States pointed out that the disputed language was taken verbatim from an

31

earlier opinion of this Court, United States v. Raborn, 872 F.2d 589, 595 (5th Cir. 1989) (Record VIII at 54). The trial judge overruled appellant's objection. The appellant's core argument on appeal is that the effect of the disputed language in the jury instruction was to "reliev[e] the [g]overnment of its burden of proving the requisite conduct of 'using' a firearm during and in relation to a drug offense, and allowed a conviction upon mere availability of it to provide protection." Appellant's Brief at 20.

The standard of review we apply to jury instructions is whether "the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them." United States v. Chen, 913 F.2d 183, 186 (5th Cir. 1990), quoting United States v. Stacey, 896 F.2d 75, 77 (5th Cir. 1990); see also United States v. August, 835 F.2d 76, 77 (5th Cir. 1987). Further, "the presence of an imprecise or misleading statement within the jury instruction does not by itself entitle defendants to a reversal. Reversible error exists only if the jury charge, as a whole, misled the jury as to the elements of the offense." See United States v. Kington, 875 F.2d 1091, 1098 (5th Cir. 1989), cert. denied, 481 U.S. 1014, 107 S.Ct. 1888, 95 L.Ed.2d 495 (1987).

In the present case, the jury instruction, taken as a whole, stated the proper elements of the offense. The disputed language was lifted directly from the Raborn case.

32

Significantly, the jury was not instructed that "use" could be established merely by a showing of the "availability" of the weapons.  Nor did the instruction charge the jury that it could convict the appellant for "mere possession" of firearms.  Instead, the instruction unmistakenly informed the jury that there must be some connection between the possession or availability of the firearm and the appellant's involvement in drug trafficking.  The instruction, as a whole, informed the jury that it must find beyond a reasonable doubt that the firearm was an integral part of the drug offense charged.

Furthermore, our discussion in section II of this Opinion amply demonstrates that, in § 924(c) cases, the government may satisfy its burden by demonstrating that the firearm merely facilitated the underlying offense.  Our synthesis of the relevant cases also leads us to conclude that the concepts encompassed by the word "facilitate" includes availability to provide protection.  In <u>Molinar-Apodaca</u>, we employed the exact language disputed by the appellant here to state the government's burden under § 924(c) that "the government is only obliged to show that the firearm was <u>available to provide protection</u> to the defendant in connection with his engagement in drug trafficking; a showing that the weapon was used, handled or brandished in an affirmative manner is not required."  889 F.2d at 1424 (emphasis added).  We think it is evident that the language disputed here is an accurate characterization of the government's burden of

33

proof.   Accordingly, we reject appellant's contention that the jury charge in question was error.

## ISSUE IV

**WHETHER THE ABSENCE OF A PORTION OF
THE TRIAL RECORD CONSTITUTES
REVERSIBLE ERROR.**

During its deliberations, the jury became deadlocked. In the course of its attempts to break the deadlock, the jury sent three notes to the judge.  The first note requested a copy of Title 18 U.S.C. § 924(c)(1).  The judge's written reply stated that a copy of the statute was reproduced in the charge.  The second note indicated that, as to one of the counts, the jury was in hopeless disagreement.  In response, the judge instructed the jury to go to lunch.  Following lunch, the jury sent the judge a third note.  This third note again indicated that the jury could not agree.  In response, the judge asked the jury, in writing, over which count was it deadlocked.  The jury informed the judge that it was count 9, the weapons charge drawn under Title 18 U.S.C. § 924(c)(1).  At that point, the judge called the jury back into the courtroom to instruct them verbally.  Following the judge's instructions, the jury returned a verdict of guilty on all counts in less than an hour.[12]

Following the trial and during the appeals process, the attorney currently representing the appellant on appeal, Mr. R.H.

---

[12]The clerk's docket sheet reflects that, after the third note, the court "called jury into the courtroom and instructed them as to the charge and told them to try once again."  These same entries reflect that at 3:05 p.m., a verdict of guilty was rendered as to all counts.  (Docket sheet, R-214).

34

Wallace, Jr.,[13] replaced the appellant's court-appointed trial attorney, Mr. Tim Evans.  Mr. Wallace was not a stranger to the appellant.  In fact, Wallace's previous involvement with the appellant was extensive.  Wallace had represented the appellant in an earlier criminal trial (docketed in this Court as No. 90-1957) which lasted eleven months and also was appealed.  Wallace additionally had assisted Mr. Evans in the planning of a mental competency examination in the instant case and then directly participated in the proceedings of a joint mental competency hearing involving both cases.  Furthermore, Mr. Wallace had participated in the sentencing phase of the instant cause, having filed objections to the presentence report when it appeared that Mr. Evans would be unavailable.  He also appeared at the joint sentencing hearing involving both cases[14] and had argued for a downward departure from the sentencing guidelines in the instant cause.

Upon preparing appellant's appeal of the convictions herein, Mr. Wallace, ordered a transcript of the entire trial proceedings and specifically requested a transcript of the court's instructions to the jury following the jury's third note.

---

[13]Mr. Wallace states that he volunteered to represent the plaintiff on appeal because the appellant requested that he do so and because the effort required of his fifty-attorney firm to prepare the instant appeal would be relatively de minimis compared to the appeal from the earlier trial in which Mr. Wallace represented the appellant.

[14]See supra note 2, at p. 5.

The official court reporter could not locate that portion of the transcript which contained the instructions in question.

Thereafter, on June 4, 1991, the government, by appropriate motion, asked the trial court to supplement the record in order to fill this gap. On the same day that it was filed, the government's motion was granted, essentially ex parte, and the trial court issued an order stating that the missing jury instruction was a pattern Allen charge.[15] The trial court also

---

[15]The following Allen charge is taken from the Fifth Circuit District Judges Association Pattern Jury Instructions (Criminal Cases) (1990):

Members of the Jury:

I am going to ask that you continue your deliberations in an effort to agree upon a verdict and dispose of this case; and I have a few additional comments I would like for you to consider as you do so.

This is an important case. The trial has been expensive in time, effort, and money to both the defense and the prosecution. If you should fail to agree on a verdict, the case is left open and must be tried again. Obviously, another trial would only serve to increase the cost to both sides, and there is no reason to believe that the case can be tried again by either side better or more exhaustively than it has been tried before you.

Any future jury must be selected in the same manner and from the same source as you were chosen, and there is no reason to believe that the case could ever be submitted to twelve men and women more conscientious, more impartial, or more competent to decide it, or that more or clearer evidence could be produced.

If a substantial majority of your number are for a conviction, each dissenting juror ought to consider whether a doubt in his own mind is a reasonable one since it appears to make no effective impression upon the minds of the others. On the other hand, if a majority or even a lesser number of you are for acquittal, the other jurors ought seriously to ask themselves again, and most thoughtfully, whether they do not have a reason to doubt the correctness of a judgment which is not shared by several of their fellow jurors, and whether they should distrust

ordered the clerk to prepare and certify a supplemental record containing a pattern <u>Allen</u> charge.

Wallace stated that when the United States notified him of the attempt to supplement the record, he told the Assistant United States Attorney that he would oppose the motion. Wallace filed an objection to the United States' motion and to the court's order, arguing that the supplementation of the record in such an <u>ex</u> <u>parte</u> manner deprived the appellant of an opportunity to be heard. He further opined that the supplemental portion of the record was inappropriate because it was created solely from the recollections of the trial court and the government and, consequently, did not include any objections that might have been made by the appellant at trial.

Earlier, we addressed this matter and, in a per curiam order, remanded this cause to the trial court for an evidentiary

---

the weight and sufficiency of evidence which fails to convince several of their fellow jurors beyond a reasonable doubt.

Remember at all times that no juror is expected to yield a conscientious conviction he or she may have as to the weight or effect of the evidence. But remember also that, after full deliberation and consideration of the evidence in the case, it is your duty to agree upon a verdict if you can do so without surrendering your conscientious conviction. You must also remember that if the evidence in the case fails to establish guilt beyond a reasonable doubt, the accused should have your unanimous verdict of Not Guilty.

You may be as leisurely in your deliberations as the occasion may require and should take all the time which you may feel is necessary.

I will ask now that you retire once again and continue your deliberations with these additional comments in mind to be applied, of course, in conjunction with all of the instructions I have previously given to you.

37

hearing pursuant to the appellant's objections.  The hearing was
held on November 7, 1991.[16]  Following the hearing, the trial
court filed a new supplemental record which included a transcript
of the hearing and a short order.  The order states that after
its receipt of the third note, the court called the jury into the
courtroom and read them the modified <u>Allen</u> charge.  The order
further stated that the court believed that the appellant's
counsel at trial objected to the <u>Allen</u> charge, based on the
court's observation that it is customary for that attorney to so
object whenever the <u>Allen</u> charge is given.

---

[16]The following individuals testified at the evidentiary
hearing:  Donna DuMouchel, the official court reporter;  Robert
Day, the jury foreman;  Tim Evans, the appellant's attorney at
trial;  and R.H. Wallace, the appellant's attorney on appeal.

The court reporter testified that she had lost her
trial notes and that her back-up tape system had malfunctioned.
She vividly recalled the court giving the <u>Allen</u> charge, because
she had not heard it often.  She testified that she had no
recollection whether the trial judge made any additional comments
after the charge and before the jury went back to the jury room
to deliberate.  Nor did she had have any memory whether the
defense counsel made any objection to the charge.

The jury foreman also recalled the <u>Allen</u> charge.  He
stated that he remembered the trial judge emphasizing the
"urgency" of reaching an agreement, that there would be no new
evidence, that it would be quite expensive to impanel another
jury, that the jury should try harder to come to a verdict, and
that the jury had a duty to agree.

The appellant's trial counsel testified that it is his
practice to object to the giving of an <u>Allen</u> charge.  He also
testified that he would have requested a mistrial if the charge
had been given.

The appellant's appellate counsel offered testimony to
show that his involvement with this case was limited to pre-trial
matters and to the sentencing hearing.

The appellant argues to us on appeal that since a substantial and significant portion of the trial transcript is missing and since he is now represented by counsel other than his attorney at trial, reversible error exists, even absent a showing of specific prejudice. Contending that this circumstance constitutes a violation of the Court Reporter Act, 28 U.S.C. § 753,[17] the appellant bases his argument primarily on an earlier opinion of this Court, United States v. Selva, 559 F.2d 1303 (5th Cir. 1977) (otherwise known as Selva II).

In the precursor case to Selva II, United States v. Selva, 546 F.2d 1173 (5th Cir. 1977) (otherwise known as Selva I), we confronted a situation where that portion of the trial transcript which contained the closing arguments was lost and where the appellant retained a different attorney for the appeal. Id. The appellant argued that he was prejudiced because his new appellate counsel did not have a transcript of the closing arguments. Although the appellant alleged no specific error, he nonetheless alleged that this violation of the Court Reporter Act necessitated reversal. Id.

---

[17]The Court Reporter Act, Title 28 U.S.C. § 753(b) (1970) states in relevant part:

> One of the reporters appointed for each such court shall attend at each session of the court and at every other proceeding designated by rule or order of the court or by one of the judges, and shall record verbatim by shorthand or by mechanical means which may be augmented by electronic sound recording ... (1) all proceedings in criminal cases had in open court ... .

The Selva I Court remanded the case and instructed the trial court to conduct a hearing in order to supplement the record with a "substantially verbatim account of the proceedings" or, if deemed to be just, grant a new trial. Id. The Selva I Court instructed the court below to employ sources such as the trial court's notes, the court reporter's notes, and the testimony of witnesses, including the trial attorneys, in order to reconstruct the missing portion of the trial transcript. Id.

On remand to the trial court, it was disclosed at the evidentiary hearing that the record of the closing arguments was irretrievably lost due to the unfortunate combination of an ill court reporter and malfunctioning recording equipment. Selva II, 559 F.2d at 1304. Although the trial judge concluded that a substantially verbatim reconstruction of the closing arguments was impossible, he nonetheless declined to grant a new trial. Id. at 1305.

The issue again was appealed. The Selva II Court reversed the judgment of the district court and remanded for a new trial. Id. The Selva II Court stated that the "language [of the Court Reporter Act] is clear and its requirements are mandatory[]" and that "[i]t is also established beyond any shadow of a doubt that a criminal defendant has a right to a record on appeal which includes a complete transcript of the proceedings at trial. Hardy v. United States, 375 U.S. 277, 84 S.Ct. 424, 11 L.Ed.2d 331 (1964)." Id. at 1305 (footnote omitted). Further, stated the Court, where the defendant is represented by the same

40

attorney at trial and on appeal, reversal is called for only if the defendant can "show that failure to record and preserve the specific portion of the trial proceedings visit a hardship upon him and prejudices his appeal." Id. at 1305. However, "[w]hen ... a criminal defendant is represented on appeal by counsel other than the attorney at trial, the absence of a substantial and significant portion of the record, even absent any showing of specific prejudice or error, is sufficient to mandate reversal." Id. at 1306. The Selva II Court provided the following explanation for its ruling:

> The wisdom of this rule is apparent. ... When a defendant is represented on appeal by the same attorney who defended him at trial, the court may properly require counsel to articulate the prejudice that may have resulted from the failure to record a portion of the proceedings. ... The attorney, having been present at trial, should be expected to be aware of any errors or improprieties which may have occurred during the portions of the proceedings not recorded. But when a defendant is represented on appeal by counsel not involved at trial, counsel cannot reasonably be expected to show specific prejudice. Often, however, even the most careful consideration of the available transcript will not permit us to discern whether reversible error occurred while the proceedings were not being recorded. In such a case, to require new counsel to establish the irregularities that may have taken place would render illusory an appellant's right to notice plain errors or defects, Hardy, 375 U.S. at 280, 84 S.Ct. 424, and render merely technical his right to appeal.

Id.

Following our holding in Selva II, we decided United States v. Taylor, 607 F.2d 153 (5th Cir.), reh'g denied, 614 F.2d

41

294 (5th Cir. 1980).  In _Taylor_, the court reporter failed to make a verbatim transcript of the trial court's charge to the jury.  _Id._ at 154.  The trial judge gave each juror a written copy of the charge, but the court reporter did not attempt to transcribe the charge as the judge read it from the bench.  _Id._ The _Taylor_ Court phrased the issue thusly:  "Our problem arises from the fact that, while the written charge is part of the record on appeal, we have no way of knowing whether there was any variance between that writing and the oral charge."  _Id._  We remanded and instructed the trial court to determine whether the written charge could be viewed as the equivalent of the oral charge.  _Id._

     In _Taylor_, we again emphasized that the requirement of the Court Reporter Act, that a verbatim transcript be made of "all proceedings in criminal cases had in open court" is mandatory and that this rule is "not to be overridden by local practice."  _Id._ at 154, quoting from _United States v. Brumley_, 560 F.2d 1268, 1280 (5th Cir. 1977).  We further stated in _Taylor_, "we have not chosen to adopt a per se rule requiring reversal of any and all omissions.  Instead, we apply one of two standards depending on whether or not the defendant is represented on appeal by the same attorney that represented him at trial."  _Id._ at 154.

     From _Selva II_ and its progeny, we thus discern three interrogatories to be answered in this case:  (1) which standard of review to apply, which is dependent upon whether the defendant

42

is represented on appeal by the same attorney who defended him at trial;  (2) if the appellate counsel differs, whether the lost portion is substantial and significant;  and (3) if the portion is substantial and significant, whether the trial court's reconstruction amounts to a "substantially verbatim account" of the missing portion of the transcript.  In the instant case, we need not spend much time on the first two inquiries.

We reject the government's contention that appellant's appellate attorney should be deemed the functional equivalent of appellant's trial attorney based upon appellate attorney's participation in the trial proceedings below.  As earlier outlined, that participation was limited to pre-trial matters involving the appellant's competency to stand trial and to matters of sentencing.  Appellant's current counsel was not present when the instruction in issue was given to the jury. Thus, appellant's appellate counsel, unlike appellant's trial counsel, cannot articulate here what prejudice has befallen upon appellant resulting from the missing portion of the record.  Nor can the court expect appellate counsel "to be aware of any errors or improprieties which may have occurred during the portions of the proceedings not recorded."  United States v. Selva, 559 F.2d 1303, 1306 (5th Cir. 1977).  Hence, we hold that on appeal the appellant is being represented by counsel other than his attorney at trial.

We also hold that the jury charge in issue is a "substantial and significant" portion of the trial record.  A

43

trial court's jury instructions designed to educate the jury on the applicable law of the case and to prescribe the contours of deliberations by a jury sworn to obey are certainly a "substantial and significant" portion of the trial record.

We hold here that the record reconstructed at the evidentiary hearing on remand was a substantially verbatim account of the lost jury charge. The court reporter testified that the trial court gave the jury the modified <u>Allen</u> charge which she identified at the evidentiary hearing. Neither the court reporter, the appellant's trial attorney, nor the jury foreman indicated that the trial judge may have deviated from the written modified <u>Allen</u> charge instruction, taken from the <u>Pattern Jury Instructions</u> (<u>Criminal Cases)</u>, United States Fifth Circuit District Judges Association (1990).

Further, we find no error in the trial court's decision to give this charge. On many occasions, we have upheld the language of the charge. <u>United States v. Gordon</u>, 780 F.2d 1165, 1177 (5th Cir. 1986). And, we have stated that the trial court has broad discretion to give the <u>Allen</u> charge when the jury is deadlocked. <u>Id.</u>

Our holding here on the record reconstruction is not in conflict with the rule announced in <u>Selva II</u>. There, the missing trial record was trial counsel's closing arguments, an omission which was almost impossible to reconstruct in a substantially verbatim manner. A similar problem plagued the omissions in

44

those cases upon which <u>Selva II</u> relied.  <u>Id.</u> at 1306 n.6.[18]

However, unlike the missing part of the record in <u>Selva II</u> and in

those cases upon which <u>Selva II</u> relies, the record of the loss of

a pattern jury instruction, faithfully read, is simply easier to

reconstruct as a substantially verbatim account.

Accordingly, the judgment of the district court is

AFFIRMED.

---

[18]<u>United States v. Gregory</u>, 472 F.2d 484 (5th Cir. 1973) (missing voir dire and opening statements);  <u>United States v. Garcia-Bunifascio</u>, 443 F.2d 914 (5th Cir. 1971) (missing government's closing argument);  <u>United States v. Upshaw</u>, 448 F.2d 1218, 1223 (5th Cir. 1971), <u>cert. denied</u>, 405 U.S. 934, 92 S.Ct. 970, 30 L.Ed.2d 810 (1972) (missing defense arguments); <u>United States v. Rosa</u>, 434 F.2d 964 (5th Cir. 1970) (missing entire transcript);  <u>United States v. Atilus</u>, 425 F.2d 816 (5th Cir. 1970) (missing entire transcript);  <u>Stephens v. United States</u>, 289 F.2d 308 (5th Cir. 1961) (missing voir dire and closing arguments).