# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
September 30, 2015

Lyle W. Cayce
Clerk

No. 14-60846

UNITED STATES OF AMERICA,

> Plaintiff - Appellee

v.

MARTEL TORRES BARNES, also known as Marty Mar, also known as
M&M; ROGER RANDALE JONES, also known as Roger Randell Jones, also
known as Hitman; KENTORRE D. HALL, also known as Toto, also known as
Toe Doe,

> Defendants - Appellants

Appeals from the United States District Court
for the Southern District of Mississippi

Before STEWART, Chief Judge, and BARKSDALE and PRADO, Circuit
Judges.

CARL E. STEWART, Chief Judge:

Martel Torres Barnes ("Barnes"), Roger Randale Jones ("Jones"), and
Kentorre D. Hall ("Hall") (collectively, the "Appellants") were charged in a
superseding indictment with: (1) conspiracy to possess with intent to
distribute 500 or more grams of methamphetamine ("meth"), less than fifty
kilograms of marijuana, and some amount of cocaine all in violation of 21
U.S.C. §§ 841(a)(1) and 846; (2) maintaining a drug-involved premises in
violation of 21 U.S.C. § 856(a) and 18 U.S.C. § 2; (3) conspiracy to possess a

No. 14-60846

firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. §§ 924(o) and 2; and (4) possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. §§ 924(c)(1)(A) and 2. Hall was also charged with the additional count of possession with intent to distribute meth in violation of 18 U.S.C. § 841(a)(1). Following a six-day trial, a jury found Appellants guilty on all counts and the district court sentenced each Appellant to life imprisonment. Appellants filed timely appeals challenging the jury's verdict and the district court's rulings on various grounds. For the reasons explained herein, we AFFIRM.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

In 2012, Special Agent Blair Lobrano with the Bureau of Alcohol, Tobacco, Firearms & Explosives ("Agent Lobrano") began investigating the murders of Roland Smith and his parents in Jefferson Davis County, Mississippi (the "Smith Triple Murder").[1] In carrying out this investigation, Agent Lobrano developed an understanding of a drug trafficking operation occurring at 314 Cedar Grove, Prentiss, Mississippi (the "Cedar Grove Residence"). Specifically, Agent Lobrano identified Appellants as involved in the operation (the "Cedar Grove Operation").[2] Ebony Chaney ("Chaney") and Kalie Holsen ("Holsen") were interviewed as part of the investigation and provided significant testimony at trial.[3]

Chaney lived at the Cedar Grove Residence with Hall for approximately one month between February and March 2012. She explained that Barnes and

---

[1] Agent Lobrano was also investigating the murder of Joseph McDonald. However, evidence at trial linking Appellants to Joseph McDonald's murder is not a subject of this appeal.

[2] A fourth individual, Mikell Darrell Gardner, was also named in the indictment. However, he pleaded guilty before trial and is not a part of this appeal.

[3] Holsen's and Chaney's testimony was corroborated and supplemented by similar testimony from a number of other trial witnesses.

2

No. 14-60846

Jones assisted Hall[4] in selling meth, cocaine, and marijuana out of the Cedar Grove Residence. For example, Chaney saw Barnes bagging drugs and saw Barnes and Jones take drugs to customers. On one occasion, she saw a quarter pound of meth at the house. Chaney also saw a number of loaded firearms during her stay. In particular, she saw Barnes and Jones each carrying a weapon.

Holsen testified that she purchased meth from Hall at the Cedar Grove Residence between 2010 and 2012.[5] She testified that Barnes lived at the Cedar Grove Residence, was often at the residence when she was there to buy drugs, and sometimes served as Hall's helper in the drug transactions. She also testified that Jones stayed at the Cedar Grove Residence, helped with the operation, carried a gun with him while at the house, acted as a guard for Hall on one occasion, and once sold a quarter ounce of meth to another customer. She also saw firearms when she purchased meth from Hall.

In October 2013, the Mississippi Bureau of Narcotics executed a search warrant for the Cedar Grove Residence. Agent Kenrick Short ("Agent Short") testified that during the search law enforcement seized, *inter alia*, a number of firearms (including an AK-47), several digital scales, and plastic baggies. Agent Short also testified that the seized digital scales and baggies are commonly used for distributing narcotics and that the firearms found in the house are often used in drug trafficking for intimidation.

Evidence from the search, along with other trial testimony, linked the Cedar Grove Operation to the Smith Triple Murder. For example, a ballistics

---

[4] Hall is quadriplegic (except for limited use of his right arm) and therefore relied on helpers to carry out tasks.

[5] In addition to her own drug purchases, Holsen brought other individuals to purchase meth at the Cedar Grove Residence. For example, Chance Graves testified that he went to the Cedar Grove Residence with Holsen on a number of occasions to buy meth and testified to Barnes's and Hall's involvement in the transactions.

expert testified that shell casings from the murder scene matched the AK-47 seized from the Cedar Grove Residence.  There was also testimony that Roland Smith had previously purchased meth from Hall, and one witness testified that, shortly before the murders, she told Hall that Roland Smith was a "snitch."  Other testimony provided additional circumstantial evidence that Jones, Barnes, and Hall were involved in the murders.

In a separate investigation into a string of armed robberies in Hattiesburg, Mississippi, the Hattiesburg Police Department executed a search warrant on a trailer where Hall and Barnes were residing.  Agent Brandon McLemore testified that, in conducting the search, he took possession of cell phones belonging to Hall and Barnes.  At trial, the Government introduced certain text messages, videos, and photographs from the cell phones to demonstrate that Hall and Barnes were involved in drug trafficking and firearms.

In total, the Government called thirty-four witnesses.  At the close of the Government's case, Appellants moved for judgments of acquittal, and the district court denied their motions.  None of the Appellants testified at trial or called witnesses in their defense.  The jury found Appellants guilty on all counts, and the district court sentenced each to life imprisonment, followed by five years of supervised release.

## II.    DISCUSSION

### A.

On appeal, Jones and Barnes challenge the sufficiency of the Government's evidence to support the charges in the indictment.  Because Jones and Barnes preserved the issue below, we engage in a *de novo* review to "determine whether a reasonable jury could find that the evidence establishes the guilt of the defendant[s] beyond a reasonable doubt."  *United States v. Williams*, 507 F.3d 905, 908 (5th Cir. 2007).  "We view the evidence in the light

most favorable to the government and give the government the benefit of all reasonable inferences and credibility choices." *Id.*

Jones's and Barnes's sufficiency challenges to their drug trafficking and firearms convictions warrant little discussion.  With respect to their drug trafficking convictions, both Barnes and Jones acknowledge that multiple trial witnesses identified them as playing an active role in the drug trafficking operation at the Cedar Grove Residence; their sole quarrel is that these witnesses lacked credibility.  This argument holds no weight given the quantity and consistency of the evidence presented at trial, and that "[c]redibility issues are for the finder of fact and do not undermine the sufficiency of the evidence." *United States v. Morgan,* 117 F.3d 849, 854 n.2 (5th Cir. 1997).  Regarding their firearms convictions, both Jones and Barnes also concede that "it was proven beyond a reasonable doubt to the jury that if the [Appellants] were guilty of the conspiracy and drug sale counts, they certainly possessed and/or used guns to further this business."  A review of the trial record confirms this concession.

Jones's and Barnes's convictions for maintaining a drug-involved premises in violation of 21 U.S.C. § 856 require more analysis.  In determining whether a person "maintained" a drug-involved premises under Section 856, we typically consider whether a defendant (1) has an ownership or leasehold interest in the premises, (2) was in charge of the premises, or (3) exercised "supervisory control" over the premises. *See United States v. Soto-Silva,* 129 F.3d 340, 346 (5th Cir. 1997); *see also Morgan,* 117 F.3d at 856.  In addition, the term "maintain" "connotes a degree of continuity and duration." *Morgan,* 117 F.3d at 857.  Although the Government introduced evidence that Barnes and Jones were often at the Cedar Grove Residence, it introduced no evidence showing that Jones or Barnes owned or leased the property.  In addition, the Government's evidence established that Hall, not Jones or Barnes, was in

charge of and exercised "supervisory control" over the premises. Thus, the Government may have failed to introduce sufficient evidence to show that Barnes and Jones themselves violated Section 856.

However, we need not decide the issue because Barnes and Jones are subject to criminal liability for aiding and abetting Hall's violation of Section 856. To prove that a defendant aided and abetted, the Government must establish that (1) the elements of the substantive offense occurred and (2) the defendant associated with the criminal activity, participated in it, and acted to help it succeed. *See United States v. Delagarza–Villarreal*, 141 F.3d 133, 140 (5th Cir. 1997); *see also* 18 U.S.C. § 2.

Here, the Government introduced sufficient evidence to establish the substantive elements of the offense as to Hall. In order to establish a violation of Section 856(a), the Government must prove that the defendant (1) intentionally and knowingly (2) opened or maintained a place (3) for the purpose of using, manufacturing or distributing a controlled substance. *United States v. Roberts*, 913 F.2d 211, 219 (5th Cir. 1990). Hall lived at the Cedar Grove Residence and several witnesses explained that he was in charge of the premises. Evidence at trial also showed that Hall maintained the premises for the purpose of distributing controlled substances (primarily meth, but also, to a lesser extent, marijuana and cocaine).[6]

The Government also established the second element of aider and abettor liability. As previously discussed, Barnes and Jones were actively involved in the Cedar Grove Operation and served as helpers for Hall in order

---

[6] Note that "the government need not prove that drug distribution was the primary purpose of [the defendant's maintaining the place], merely that drug distribution was a significant purpose." *United States v. Meshack*, 225 F.3d 556, 571 (5th Cir. 2000) (internal quotations omitted), *amended on reh'g in part,* 244 F.3d 367 (5th Cir. 2001), *overruled on other grounds, United States v. Cotton*, 535 U.S. 625 (2002).

No. 14-60846

to make the operation successful.  Therefore, Jones and Barnes are subject to criminal liability for Hall's substantive violation of Section 856.

Considering all of the evidence presented at trial, we conclude that a reasonable jury could find that Jones and Barnes were guilty of the charged offenses.

**B.**

Hall argues that certain Facebook and text messages attributed to him at trial were introduced into evidence with insufficient authentication under Federal Rule of Evidence 901.  This issue first arose at trial during the testimony of Holsen.  Holsen testified that, although Hall is quadriplegic, he is able to operate a cell phone—including texting and using Facebook—utilizing his mouth and some limited movement in his right arm.  After laying additional foundation, the Government attempted to introduce Facebook and text messages between Holsen and Hall.  Hall objected to the authenticity of the evidence, and the district court overruled the objections.  The introduced Facebook and text messages generally related to drug transactions between Holsen and Hall.

A district court's evidentiary decisions are reviewed for abuse of discretion and any error in admitting evidence is subject to harmless error review.  *United States v. Morgan*, 505 F.3d 332, 339 (5th Cir. 2007).  Authentication is a condition precedent to the admission of evidence and is satisfied when a party presents evidence sufficient "to support a finding that the item is what the proponent claims."  Fed. R. Evid. 901(a); *United States v. Barlow*, 568 F.3d 215, 220 (5th Cir. 2009).  However, "[t]he standard for authentication is not a burdensome one."  *United States v. Jackson*, 636 F.3d 687, 693 (5th Cir. 2011).

The Government laid sufficient foundation regarding Holsen's Facebook and text messages.  Holsen testified that she had seen Hall use Facebook, she

7

recognized his Facebook account, and the Facebook messages matched Hall's manner of communicating. She also testified that Hall could send text messages from his cell phone, she had spoken to Hall on the phone number that was the source of the texts, and the content of the text messages indicated they were from Hall. Although she was not certain that Hall authored the messages, conclusive proof of authenticity is not required for the admission of disputed evidence. *United States v. Jimenez Lopez*, 873 F.2d 769, 772 (5th Cir. 1989).[7] As the district court correctly recognized, the jury holds the ultimate responsibility for evaluating the reliability of the evidence. *See Barlow*, 568 F.3d at 220.[8]

Regardless, any potential error in admitting the text and Facebook messages was harmless. The text and Facebook messages at issue were about drug transactions, and were, therefore, relevant to all of the charged counts. However, the content of the messages was largely duplicative of what Holsen and numerous other witnesses testified to directly. Improperly admitting evidence that is duplicative of testimony at trial does not warrant reversal under harmless error review. *See United States v. Bell*, 367 F.3d 452, 469 (5th Cir. 2004). Further, any error was also harmless "given the overwhelming

---

[7] The district court properly admitted text and Facebook message evidence at other points in trial for the same reasons.

[8] Hall's citations to *United States v. Winters*, 530 F. App'x 390 (5th Cir. 2013), and *United States v. Alejandro*, 354 F. App'x 124 (5th Cir. 2009), are inapposite. In *Winters*, the Government suggested that the defendant owned or controlled items present in pictures from the defendant's social media webpage, but the authenticating witness was "not able to recognize and identify the objects in the photos or show that [the defendant] . . . had possession or control of the pictured items." *Winters*, 530 F. App'x at 395. In contrast, here Holsen testified that the messages from Hall's Facebook page represented her conversations with Hall, and Holsen provided testimony suggesting that she was in fact conversing with Hall. *Alejandro* actually appears to support the Government's argument: the court there upheld the introduction of a computer-generated map because the sponsoring witness testified that (1) he was familiar with the area depicted in the map and (2) the map was accurate. 354 F. App'x at 128.

No. 14-60846

evidence of [Hall's] guilt." *See United States v. Clark*, 577 F.3d 273, 288 (5th Cir. 2009) (collecting cases).

Therefore, we conclude that Hall's challenge to the introduction of Facebook and text messages at trial is without merit.

## C.

Hall also argues on appeal that the district court violated his Sixth Amendment right to confront witnesses against him by limiting cross-examination regarding certain witnesses' prior arrests. This issue came up on two occasions. First, on cross-examination of Holsen, Hall's attorney asked, "How many times have you been arrested?" The Government objected to the question as irrelevant, and the district court sustained the objection, ruling that "[a]n arrest is not something that you can use to impeach a witness" unless there is evidence the witness received a deal in exchange for testifying. The issue of a witness's prior arrests came up again during the cross-examination of Kevin Sims ("Sims"). Hall's counsel had information that Sims faced pending charges at the time of his interview with law enforcement prior to Appellants' trial. However, based on the judge's prior rulings, Hall's counsel was only able to ask Sims about the arrest outside the presence of the jury.

"Alleged violations of the [Sixth Amendment's] Confrontation Clause are reviewed *de novo,* but are subject to a harmless error analysis." *Bell*, 367 F.3d at 465. If there is no Sixth Amendment violation, limits on cross-examination are reviewed for abuse of discretion. *United States v. Restivo*, 8 F.3d 274, 278 (5th Cir. 1993). The Sixth Amendment generally requires that the defendant be permitted to "expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *United States v. Skelton*, 514 F.3d 433, 439 (5th Cir. 2008). However, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever

way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (emphasis in original).

Under this general rubric, we have held that "neither prior bad acts of a witness nor the mere fact that a witness has been arrested or indicted is generally admissible for impeachment purposes." *United States v. Pettigrew*, 77 F.3d 1500, 1516 (5th Cir. 1996) (collecting cases). However, an arrest or accusation that arises out of the transaction at issue is admissible to show the possible bias of the witness. *Id.*

With this understanding in mind, the district court clearly acted within its discretion in limiting Appellants' cross-examination. For example, the question at issue during Holsen's testimony—"How many times have you been arrested?"—is a paradigm of improper impeachment, as it seeks evidence of the witness's prior arrests, without linking those arrests to the case at hand or to the witness's motivation for testifying. *See id.* at 1516. Similarly, Appellants were prohibited from questioning Sims regarding his prior arrest in front of the jury, but they were not foreclosed from exploring Sims's possible bias or motivation through some other permissible avenue (*e.g.*, by showing that Sims received a deal from the prosecution in exchange for his testimony).

Accordingly, we hold that the district court acted within its discretion in limiting Hall's cross-examination of witnesses.

### D.

At trial, Hall and Barnes objected to Sims's competency to testify because, during his third cross-examination, Sims admitted that he had smoked meth on the morning of his testimony. The district court overruled the objections, stating that "the believability of the witness would be a jury question." Appellants argue on appeal that the district court erred by failing to make a threshold determination of Sims's competency to testify.

"[C]ompetency of a witness is within the sound discretion of the trial court, and its determination will only be reviewed for abuse of discretion." *Hayes v. United States*, 899 F.2d 438, 450 (5th Cir. 1990). Federal Rule of Evidence 601 states that "[e]very person is competent to be a witness unless [the Federal Rules of Evidence] provide otherwise." Despite this presumption, the district court must still determine whether a witness "is capable of communicating relevant material and understands she has an obligation to do so." *United States v. Saenz*, 747 F.2d 930, 936 (5th Cir. 1984).

Here, the district court judge appears to have made a proper threshold determination of competence. Sims testified—without objection to his competency—through direct examination and two cross-examinations. Once Sims's drug use came to light, and he completed his testimony, the judge examined Sims directly regarding his competency. Apparently satisfied, the judge determined that Sims's drug use was a matter of credibility for the jury.

That Sims used meth the morning of his testimony, appeared confused at times, and apparently had trouble remembering some events, does not mean the district court abused its discretion in allowing the testimony. Neither in their briefing nor at oral argument were Appellants able to identify any instance in the record where Sims's physical demeanor or coherence supported their claims. Further, "the presumption is that [e]very person is competent to be a witness if that person has personal knowledge of a matter and states that [he] will speak truthfully." *See United States v. Blankenship*, 923 F.2d 1110, 1116–17 (5th Cir. 1991) (internal quotations omitted). Sims clearly had personal knowledge of a relevant matter—he testified that Hall, with the assistance of Barnes, sold him meth. And he stated on both cross-examination

11

No. 14-60846

and directly to the district court judge that he had testified truthfully.[9] Because Sims met the minimum threshold for competency to testify, any remaining issues with the credibility of his testimony were properly left to the jury. *See id.*; *see also Gurleski v. United States*, 405 F.2d 253, 267 (5th Cir. 1968) (previous use of narcotics "affects only the weight and credibility of testimony, not competency of the witness"). Therefore, the district court did not abuse its discretion in denying Appellants' motion to strike Sims's testimony.

## E.

Jones and Barnes challenge on appeal the admissibility of evidence at trial linking them to the Smith Triple Murder. Prior to trial, Jones filed a motion *in limine* to exclude references to the homicides at trial as improper character evidence under Federal Rule of Evidence 404(b). The district court denied Jones's motion, explaining that the murder evidence is intrinsic to the firearms counts. The judge did note "the prejudicial nature of this evidence" and stated that he would provide a limiting instruction to the jury. At trial, Appellants again objected to the evidence, arguing that its probative value was substantially outweighed by the danger of unfair prejudice.

As stated earlier, we review a district court's evidentiary rulings for an abuse of discretion. *See United States v. Garcia Abrego*, 141 F.3d 142, 174 (5th Cir. 1998).

---

[9] Appellants' citation to *United States v. Killian*, 524 F.2d 1268 (5th Cir. 1975), and *Hall v. Whitley*, 998 F.2d 1014 (5th Cir. 1993) (unpublished), does not change this conclusion. In *Killian*, the court acknowledged that the witness was a heavy drug user and that he suffered from hallucinations, but found that the trial court acted within its discretion in refusing to strike the testimony. 524 F.2d at 1275. The court did mention that the witness "had not been under the influence of drugs for several days," *id.*, but certainly never indicated that more recent drug use would have been dispositive on the issue of competence. *Hall* is simply not on point: the court there made one passing reference to competency under Louisiana state law. 998 F.2d 1014, at *3.

No. 14-60846

As an initial matter, the district court properly determined that evidence of the Smith Triple Murder was intrinsic to the firearm counts. Typically, evidence of crimes or other bad acts is not admissible to prove a person's character. *See* Fed. R. Evid. 404(b). However, evidence of bad acts is "intrinsic" and, therefore not prohibited by Rule 404(b), when it is part of the crime charged. *See United States v. Watkins*, 591 F.3d 780, 784–86 (5th Cir. 2009).[10] For example, "[w]here . . . the indictment contains a conspiracy charge, uncharged acts may be admissible as direct evidence of the conspiracy itself. An act that is alleged to have been done in furtherance of the alleged conspiracy . . . is not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged." *United States v. Miller*, 116 F.3d 641, 682 (2d Cir. 1997) (internal citations and quotations omitted); *see also Watkins*, 591 F.3d at 784–86. Here, the evidence of the Smith Triple Murder was directly relevant to the conspiracy charges because it showed that the Appellants were willing to use firearms in furtherance of their drug trafficking activities.

The remaining issue is whether the district court abused its discretion in applying Federal Rule of Evidence 403 to the homicide evidence. Even intrinsic evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403. Jones and Barnes make the unconvincing argument that evidence of the Smith Triple Murder was not probative because the firearm charges were sufficiently proven by other evidence. If the Appellants had stipulated to the use of firearms, additional evidence of the murders may have been unfairly prejudicial. *See United States v. Al–Moayad*, 545 F.3d 139, 159–62 (2d Cir. 2008). However,

---

[10] In fact, "to avoid the strictures of Rule 404(b), all the government need do is suggest a logical hypothesis of the relevance of the evidence for a purpose other than to demonstrate [the defendant's] propensity to act in a particular manner." *United States v. Krout*, 66 F.3d 1420, 1431 (5th Cir. 1995).

even if a defendant stipulates to a disputed fact, the Government may still introduce evidence of that fact if it contributes "to the overall narrative of the Government's case." *United States v. Caldwell*, 586 F.3d 338, 343 (5th Cir. 2009); *see also Old Chief v. United States*, 519 U.S. 172, 186 (1997) (generally "the prosecution is entitled to prove its case by evidence of its own choice"). Here, the Appellants refused such a stipulation at trial and evidence of the Smith Triple Murder contributed to the overall narrative of the Government's case.[11]  As this court has previously explained, Rule 403 "is not designed to permit the court to 'even out' the weight of the evidence, to mitigate a crime, or to make a contest where there is little or none." *United States v. Pace*, 10 F.3d 1106, 1116 (5th Cir. 1993) (also noting that "the application of Rule 403 must be cautious and sparing").

Of course, evidence of the Smith Triple Murder was prejudicial to some extent, and the district court recognized as much.  However, "only *unfair* prejudice, *substantially* outweighing probative value . . . permits exclusion of relevant matter under Rule 403." *Id.* at 1115–16 (emphasis in original) (quoting *United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979)).  Here, the Government's evidence regarding the murders was relatively tame.  *Cf. Campbell v. Keystone Aerial Surveys, Inc.*, 138 F.3d 996, 1004–05 (5th Cir. 1998) (discussing bloody murder-scene photos).  Further, the district court was careful to provide limiting jury instructions to mitigate any potential prejudice.[12]  *See United States v. Ebron*, 683 F.3d 105, 132 (5th Cir. 2012)

---

[11] For example, Agent Lobrano testified that he came to learn of the Cedar Grove Operation through his investigation of the Smith Triple Murder.  The murder-related evidence also tended to show that Hall, Jones, and Barnes were willing to use firearms to further the Cedar Grove Operation.  Further, evidence of the murders provided an explanation for why Hall and Barnes reduced their drug trafficking and moved to Hattiesburg, Mississippi for a period of time in 2012.

[12] At the close of trial, the district court gave the jurors the following instruction: "You are to decide whether the government has proved beyond a reasonable doubt that the

No. 14-60846

(limiting instructions reduce the risk of unfair prejudice).  Finally, we have upheld the admission of such evidence in similar circumstances.  *See, e.g.*, *United States v. Baptiste*, 264 F.3d 578, 590 (5th Cir. 2001), *modified on other grounds*, 309 F.3d 274 (5th Cir. 2002) ("Although the evidence of the murders and attempted murders was prejudicial, it was necessary for the jury to understand the brutal nature of the [drug trafficking] conspiracy."); *Garcia Abrego*, 141 F.3d at 175–76 (holding that the district court did not abuse its discretion in admitting evidence of uncharged murders committed in furtherance of the charged drug trafficking conspiracy).

We therefore hold that the district court did not abuse its discretion in admitting evidence of the Smith Triple Murder.

**F.**

Lastly, Jones and Barnes argue that the district court improperly defined "place," as the term is used in 21 U.S.C. § 856, in its instructions to the jury.  Following trial, the jury sent a note stating, "as to count three, maintaining any place for controlled substance, does this only regard the house, or can it mean it extends to cars and property at the residence?"  In response, the district court instructed the jury that "place" "would be the house and the yard area that goes with that residence."

Jones and Barnes argue that the definition of "place" should have been limited to the residence at 314 Cedar Grove, and that the district court's instruction improperly included a vehicle as a "place."  They argue in the alternative that the statute is at least ambiguous and, thus, the rule of lenity favors their more limited interpretation.

---

defendants are guilty of the crimes charged.  The defendants are not on trial for any act, conduct or offense not alleged in the indictment."

No. 14-60846

We ordinarily review "a jury instruction for abuse of discretion, affording substantial latitude to the district court in describing the law to the jury." *United States v. Williams*, 610 F.3d 271, 285 (5th Cir. 2010).  However, when a jury instruction turns on a question of statutory construction, as it does here, the court's review is *de novo*.  *See United States v. Wright*, 634 F.3d 770, 774 (5th Cir. 2011).

Jones's and Barnes's arguments largely rely on the mistaken notion that the district court's instruction included a reference to cars, ignoring the fact that the district court judge simply instructed the jury that the term "place" includes both a "house and the yard area" to that house.  For example, Jones and Barnes argue that a "place" is "specific to one geographic location and is stationary, rather than transitory."  But that is entirely consistent with the district court's instruction:  both a house and the yard area to a house are stationary.  Just because something located in the yard area to a house may be movable—like a car or a picnic table—does not change the basic fact that the yard area itself is stationary.  Thus, the issue on appeal, properly understood, is whether a "place" can be both a "house" and the "yard area" to a house.

Our court has not yet defined "place" as the term is used in Section 856.  However, a "place" under Section 856 can certainly be a house.  Indeed, Section 856 is most often applied in this circuit to homes or other buildings.  *See, e.g.*, *Soto-Silva*, 129 F.3d at 346 (a house); *United States v. Gibson*, 55 F.3d 173 (5th Cir. 1995) (a barn adjacent to a house).  No party disputes this point.

A "place" under Section 856 is also best understood as including "the yard area" to a house.  "The appropriate starting point when interpreting any statute is its plain meaning."  *Sample v. Morrison*, 406 F.3d 310, 312 (5th Cir. 2005).  The definition of "place" is certainly not limited to buildings or structures.  *See* Oxford English Dictionary (online ed.), *available at* http://www.oed.com (last visited Sep. 9, 2015) (defining "place" as "[a]

16

particular part or region of space," "a physical locality" or "[a] piece or plot of land"). If Congress wished to limit the reach of the statute to only buildings, it could have done so.

The title of the statute also indicates that "place" includes both a house and the yard area to a house. Section 856 is entitled "Maintaining drug-involved premises." The term "premises" is commonly defined as "[a] house or building, along with its grounds." Black's Law Dictionary 1371 (10th ed. 2014). The statute's title therefore supports the district court's instruction. *See I.N.S. v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 189 (1991) (title of a statute can aid in resolving the meaning of legislative text).

Finally, the district court's interpretation is consistent with how federal courts have applied Section 856. *See, e.g.*, *United States v. Siverand*, 163 F. App'x 276, 277 (5th Cir. 2006) (defendant's "collection of 'yard fees' from the dealers who sold crack from her yard" supported a finding that she violated Section 856); *United States v. Carter*, 205 F.3d 1348 (8th Cir. 1999) (unpublished) (defendant's use of a field on a family farm to grow marijuana constituted a violation of Section 856); *United States v. Howell*, 31 F.3d 740 (8th Cir. 1994) (same).

Because the statute is not truly ambiguous after examination of these authorities, the rule of lenity does not apply. *See United States v. Cooper*, 966 F.2d 936, 944 (5th Cir. 1992).[13]

We therefore conclude that the district court did not err in instructing the jury that a "place" under 21 U.S.C. § 856 can be both a "house" and the "yard area" to a house.

---

[13] Moreover, in interpreting a different aspect of Section 856, we have noted that "Congress has manifested an attitude not of lenity but of severity toward violation[s]." *Cooper*, 966 F.2d at 944.

No. 14-60846

## III.    CONCLUSION

For the foregoing reasons, we AFFIRM Appellants' convictions.